UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THAD TIKKANEN,

                Plaintiff,                      Case Number 13-11462

v.                                                         Honorable David M. Lawson

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

                Defendant.

_____/

### OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION, DENYING PLAINTIFF'S MOTION TO REVERSE PLAN ADMINISTRATOR'S DECISION, AND DISMISSING COMPLAINT WITH PREJUDICE

This ERISA denial-of-benefits case presents two questions for resolution: (1) what is the appropriate standard of review; and (2) whether defendant Liberty Life Assurance Company of Boston wrongfully concluded that plaintiff Thad Tikkanen could perform a limited range of sedentary work and therefore was ineligible for long term disability benefits. The Court heard oral argument on the parties' cross motions on the administrative record on February 24, 2014. The Court now concludes that the arbitrary-and-capricious review standard applies, because there is no evidence in the record that any insurance "policy, contract, rider, indorsement, certificate, or similar contract document" was delivered to Tikkanen in Michigan so as to trigger Michigan Administrative Code Rule 500.2202(c), which would have voided the discretionary review clause. In addition, Liberty's determination that Tikkanen is able to perform sedentary work is not arbitrary or capricious because Liberty reasonably relied on the assessments of its consulting pulmonologist and Tikkanen's treating physician in reaching that conclusion. Therefore, the Court will deny the

plaintiff's motion to reverse the decision of the plan administrator, grant the defendant's motion to affirm the decision, and dismiss the complaint.

I.

Tikkanen filed his complaint on March 31, 2013, seeking review of the plan administrator's decision under Section 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), denying long term disability benefits. Tikkanen had worked at Home Depot as a department supervisor in the lumber department from 1997 until February 26, 2011. AR 76, 84. The parties do not state the location where Tikkanen worked, but the record suggests that it was a Home Depot store somewhere near Port Huron, Michigan, where he resides. Tikkanen's job duties included serving customers, supervising associates, maintaining stock within his department and keeping various sales records, and "driving sales" in his area of responsibility. AR 291-92. The exertional requirements of his job included "bending, stooping, reaching, twisting, lifting, pushing, pulling, moving items," "responding to public address system announcements," answering phones, "walking and standing," reading reports and labels, climbing ladders "up to the height of 12-16 feet," and lifting up to fifty pounds. AR 75-76, 293.

Liberty provides short term and long term disability insurance to Home Depot employees through a group disability income insurance policy issued on January 1, 2011. The policy was negotiated and issued by employees of Liberty who work in the State of Georgia, and by employees or agents of Home Depot, which has its principal place of business in Atlanta and is incorporated in Delaware. *Id.* ¶¶ 3-4. Neither party points to any evidence in the record suggesting that any part of the underlying insurance transaction involving the group disability policy took place in Michigan. The Liberty policy contains a discretionary clause that states:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

AR 54.

On March 27, 2011, Tikkanen submitted a claim to Liberty for short term disability benefits. Tikkanen reported that he had to leave work because of "asthmatic bronchitis," explaining that he "was feeling ill 1 week prior to [his last day of work on] 2/27/11." Tikkanen was treated by physician assistant Anthony Hamilton on February 28, 2011. Hamilton checked a box on a "Restrictions Form" provided by Liberty indicating that Tikkanen should be restricted to "sedentary" work only, defined on the form as "lifting/carrying up to 10 pounds occasionally, sitting over 50% of the time and standing/walking occasionally." AR 300. "Sedentary" was the most restrictive category provided on the form for exertional restrictions. Hamilton also added more specific restrictions in the space provided below the pre-defined checkboxes:

> Pt. not to walk for more than 200 feet at a time; not to be up continuously moving around or doing exertional movements for more than a couple minutes at a time; also is to stay out of the cold air as much as possible.

AR 30. Hamilton noted that the restrictions were imposed from February 28, 2011 to March 13, 2011, and stated that Tikkanen could return to work on March 14th. Tikkanen was seen two more times in early March due to persistent asthma symptoms. On March 15, 2011, based on the medical restrictions imposed by Hamilton and the exertional requirements in Tikkanen's job description, Liberty approved his claim for short-term disability benefits through March 20, 2011. AR 75. Liberty ultimately extended his short-term benefits through the maximum six-month period allowed under the policy, which ended on August 27, 2011. AR 79.

Under the terms of the Liberty policy, a person in Tikkanen's job classification ("Class 1") is "disabled" for the purposes of long-term benefits if "as a result of Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of Any Occupation." AR 10. The term "Any Occupation" means "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."

Near the end of Tikkanen's short-term eligibility period, Liberty initiated a file review to determine his eligibility for long-term benefits. AR 65-66. As part of this investigation, Liberty sent a request to Tikkanen's treating physician, Dr. Syed Ali. Dr. Ali completed the form on July 28, 2011, noting the following restrictions: (1) no lifting over five pounds; (2) "limit pushing, pulling," with no specified weight; (3) occasional twisting and bending (where "occasional was defined by Liberty as "1-33% of shift"); (4) never squatting, stooping, or kneeling; (5) standing five to ten minutes per hour; and (6) walking five to ten minutes per hour. The restrictions listed "sitting" as "ok" with no specified duration. AR 177. Dr. Ali stated that he anticipated that Tikkanen could return to work on September 1, 2011. *Ibid.* The form also includes a hand-written notation by Dr. Ali that "Pt. gets [shortness of breath] on walking few minutes or carrying light load like laundry basket." *Ibid.*

On the medical records Dr. Ali attached to the form, he noted during Tikkanen's office visit on July 28, 2011 that he was "doing well," but his symptoms were "still present on exertion [and he cannot] do simple chores like taking laundry basket one flight of stairs." AR 178. Ali stated that "the severity of the asthma attack(s) are moderate," the "attacks are episodic, fluctuate in intensity and remain unchanged [from the last visit]," and "[e]xacerbating factors consist of cough, chest pain, fatigue and weight gain." *Ibid.* Ali stated that "[r]elieving factors consist of allergen avoidance,

beta-agonist, medication and rest," and that Tikkanen was using inhaled steroids and a nebulizer. *Ibid.*

After Liberty received the work restrictions form and medical records from Dr. Ali, it directed its vocational rehabilitation manager to complete a transferable skills analysis and vocational review, with the specific direction that the reviewer "utilize a presumed sedentary capacity." AR 64-65. On August 10, 2011, Liberty's case manager Nancy Sullivan submitted a transferable skills analysis and vocational review in which she concluded, based on the "presumed full-time sedentary work capacity" and Tikkanen's other skills and work history, that he could perform representative occupations such as cashier at a self-service gas station, retail customer complaint clerk, and catalog sales order clerk. AR 147-48. Sullivan's report cited the definition of sedentary work from the dictionary of occupational titles as follows:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

AR 145. On August 15, 2011, Liberty denied Tikkanen's claim for long-term benefits, citing the form completed by Dr. Ali and Sullivan's report concluding that Tikkanen was qualified to perform several occupations at a sedentary level of exertion. AR 144-45.

On October 26, 2011, Dr. Ali completed a pulmonary residual functional capacity questionnaire in which he noted that (1) Tikkanen has asthma attacks "almost daily"; (2) each attack would incapacitate him for "several hours"; (3) the symptoms of attacks would "occasionally" interfere with his ability to perform "even simple work tasks" (Ali checked both the "occasionally"

and "frequently" boxes under this item and wrote a note "during asthma symptoms" underneath these checkboxes); and (4) Tikkanen was "[c]apable of low stress jobs." AR 116. Ali noted that Tikkanen "can't walk a block," could stand or walk for less than two hours a day, and could sit for six hours a day, but would likely be absent from work for four days a month on average. AR 117-18. Ali stated that Tikkanen could lift ten pounds occasionally, twist frequently, stoop or bend rarely, climb stairs occasionally, and never climb ladders. AR 117.

On the same date P.A. Anthony Hamilton completed a similar questionnaire in which he noted restrictions similar to those set out by Dr. Ali. Hamilton determined that Tikkanen could sit for up to two hours at a time and stand or walk for up to fifteen minutes. AR 121. He stated that Tikkanen could stand or walk for a total of up to two hours a day and sit for a total of "about 4 hours." *Ibid.* Hamilton stated that Tikkanen would sometimes need to take unscheduled breaks of 25-30 minutes every two to three hours during the workday. AR 122. Hamilton noted that Tikkanen could frequently lift up to ten pounds; rarely lift twenty pounds; frequently twist, stoop, bend, or crouch; and rarely climb ladders or stairs. *Ibid.* Hamilton stated that Tikkanen likely would be absent from work for four to five days out of each month. AR 123.

At the request of plaintiff's counsel, Jennifer Turecki completed a vocational assessment in which she described Tikkanen's condition as follows:

> Mr. Tikkanen has numerous symptoms of disability that are not compatible with the basic demands of competitive employment including; shortness of breath, orthopnea, chest tightness, wheezing, rhonchi, episodic acute asthma, fatigue, palpitations and coughing. He experiences these symptoms upon any exertions, exercise, or emotional upset or stress. He has daily asthma attacks that incapacitate him for hours. His symptoms of disability interfere with his ability to concentrate and pay attention frequently, meaning 34% to 66% of the time. Dr. [Ali] opines that Mr. Tikkanen is incapable of even low stress jobs. He cannot walk a block. He needs to take a break every hour where he is able to sit quietly. Mr. Tikkanen's symptoms

-6-

> of disability cause him to have good and bad days resulting in missing more than 4 days of work per month.
> . . .
> Dr. Hamilton [sic] indicates that Mr. Tikkanen can stand or walk less than 2 hours in an 8 hour day and sit about 4 hours. Dr. Hamilton [sic] indicates that Mr. Tikkanen will require unscheduled work breaks every 2 to 3 hours for 20 to 25 minutes each occurrence. Dr. Hamilton [sic] indicates that Mr. Tikkanen would miss 4 to 5 days per month of work.
> . . .
> Based on Dr. Hamilton's [sic] opinion, Mr. Tikkanen can only stand or walk less than 2 hours, and sit 4 hours. These restrictions do not allow for an 8 hour, full-time work day.

AR 124. The record does not disclose Turecki's qualifications or area of expertise. However, in her report she concluded that:

> The occupations identified [by Liberty] are not consistent with the restrictions by Dr. Hamilton and Dr. [Ali]. Based on the restrictions as opined by the physicians, Mr. Tikkanen is not a candidate for competitive employment. Per Dr. [Ali], Mr Tikkanen experiences daily asthma attacks that incapacitate him for hours. There is no competitive employment at any level that allows for a worker to be incapacitated for hours. His symptoms of disability interfere with his ability to concentrate and pay attention 34% to 66% of the time. If Mr. Tikkanen cannot remain on task 80% of the working day, he is unemployable. Dr. [Ali] states that Mr. Tikkanen is incapable of even a low stress job. All jobs at any level have stress, even work in a sheltered workshop environment. Dr. [Ali] states that based on symptoms of disability, Mr. Tikkanen would . . . miss more than 4 days of work per month. A worker cannot miss more than 2 days of work per month and expect to be employable. Dr. Hamilton indicates that Mr. Tikkanen cannot work full-time. He further opined that he would require unscheduled breaks every 2 to 3 hours for 20 to 25 minutes each occurrence. Competitive employment does not allow for unscheduled breaks. He stated that Mr. Tikkanen would miss 4 to 5 days of work per month. This is not compatible with competitive employment.

AR 125-26.

There are some inaccuracies in Turecki's report. For instance, although she asserts that Dr. Ali "opines that Mr. Tikkanen is incapable of even low stress jobs," Ali in fact checked the box corresponding to "Capable of low stress jobs" on the functional capacity questionnaire. AR 116. Turecki repeatedly cited "stress" as a disqualifying factor in reciting the reasons that Tikkanen could

-7-

not perform each of the enumerated occupations that Liberty's vocational expert had suggested he was capable, AR 125, but Dr. Ali's report stated that Tikkanen was "[c]apable of low stress jobs," AR 116, and P.A. Hamilton's report made to reference to stress as a qualifying factor. Also, although Turecki construed Dr. Ali as stating that Tikkanen's "symptoms of disability interfere with his ability to concentrate and pay attention frequently, meaning 34% to 66% of the time," Ali's reponse to this item (as noted above) is ambiguous. Ali checked both the "occasionally" and "frequently" boxes and wrote the words "during asthma symptom" in the space under the boxes. It is unclear if this means that (1) symptoms would "occasionally" interfere with job duties; (2) symptoms would "frequently" interfere; or (3) symptoms would occur "occasionally," and upon their occurrence would "frequently" interfere with job duties during the time they persisted. In context, the latter is the most sensible interpretation.

On February 10, 2012, Tikkanen's attorney submitted a letter of appeal of the August 15, 2011 denial of benefits, which included in support the questionnaires completed by Dr. Ali and P.A. Hamilton and Turecki's vocational assessment. Liberty referred the file for peer review by pulmonary specialist Dr. Benjamin Berg, who produced his report on April 9, 2012. In his report Dr. Berg concluded that the medical records supported a diagnosis of "mild asthma" and that the limitation to less than eight hours of work capacity per day that was asserted by other medical providers was "not supported by the objective findings." AR 91. Berg noted that Tikkanen's impairments "include only mildly obstructed pulmonary function testing," and stated that he could perform sedentary work if performed in "an environment free of dust, gas, fumes, strong odors, respiratory allergens, or extremes of temperature or humidity." *Ibid.*

Berg reported that he spoke with Dr. Ali on April 4, 2012, and that Ali "indicated that the claimant has mild obstruction on pulmonary function testing and despite an extensive assessment for physiologic causes of dyspnea there is no explanation for the severe symptoms reported by the claimant." AR 89. Berg noted that Ali "stated he has approached the issue of returning to work with the claimant and his wife," but "[t]he suggestion that the claimant return to work is met with an emotional response and reiteration by the claimant that he is unable to work because of dyspnea." Berg stated that "Dr. Ali agreed with my assessment that the objective findings do not support limitations or restrictions which preclude full time work at a light or sedentary duty occupation," based on Tikkanen's "demonstrated exercise capacity, repeatedly normal exams, and the claimant's entirely independent functional status with regard to [daily activities], driving, and other routine activities." *Ibid.*

On April 16, 2012, Liberty advised Tikkanen that, based on its review of his file and in particular on Berg's report, his appeal was denied. AR 83. In its letter of denial, Liberty noted that in its opinion "Ms. Turecki's opinion was based upon restrictions/limitations that are not supported by the objective medical findings, and we therefore respectfully disagree with her opinion that Mr. Tikkanen is not employable." AR 87.

The plaintiff filed his complaint in this Court seeking review and reversal of Liberty's denial of his appeal on March 31, 2013.

II.

A.

The parties dispute which of two standards of review applies in this case. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the

-9-

benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[A]pplication of the highly deferential arbitrary and capricious standard of review is appropriate only when the plan grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).

The plaintiff is quick to point out that section 500.2202(c) of the Michigan Administrative Code foils any attempt by a disability insurer to include a discretionary review clause into a disability policy. That section, which was promulgated under the authority of the Michigan Office of Financial and Insurance Services (OFIS), states that "[o]n or after [July 1, 2007], a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect." The Sixth Circuit has held that the OFIS rules "fall within the ambit of ERISA's savings clause insofar as they are state laws regulating insurance, and thus are not preempted by ERISA." *American Council of Life Insurers v. Ross*, 558 F.3d 600, 602 (6th Cir. 2009) (citing 29 U.S.C. § 1144(b)(2)(A)). "In effect, Rule 500.2202 voids discretionary clauses in insurance policies issued after July 1, 2007, thus requiring a reviewing court to apply a *de novo* standard of review." *Smiertka v. Guardian Life Ins. Co. of America*, No. 12-99, 2013 WL 1304498, at *5 (W.D. Mich. Mar. 28, 2013) (citing *Ross*, 558 F.3d at 608-09).

The defendant cites *New England Mutual Life Insurance Co. v. Gray*, 786 F.2d 406 (6th Cir. 1986), for the proposition that the Michigan statutory ban on discretionary clauses cannot apply in this case, because the policy was not "issued" in the State of Michigan. According to the defendant,

-10-

because the Michigan OFIS rules "are applicable only to policies which are issued, advertised, or delivered to any person in Michigan," the Michigan prohibition on discretionary clauses does not come into play where, as here, it is undisputed that the underlying policy was negotiated and issued by the defendant in the State of Georgia. But *Gray* does not govern the dispute here, because its sole focus was on the narrow language of Michigan Compiled Laws § 500.3606(2), which states merely that "no [group disability insurance] policy may be issued or delivered in this state unless a copy of the form shall have been filed with the commissioner and approved by him." The language of Administrative Rule 500.2202(c) is much broader, addressing insurance policies, contracts, riders, endorsements, certificates, and other contract documents that are delivered to an insured in Michigan. Mich. Admin. Code R. 500.2202(c).

The defendant also cites *Foorman v. Liberty Life Assurance*, No. 12-927, 2013 WL 1874738 (E.D. Mich. May 3, 2013), for its holding that the *de novo* standard of review did not apply to a denial of benefits under a policy containing a discretionary clause, despite the fact that the plaintiff was covered under the policy while working in Michigan. However, *Foorman* is distinguishable because there the plaintiff did not contend that any certificate was delivered to him within the State of Michigan, but argued only that "Defendant availed itself of Michigan law by filing its Certificate of Authority and policy with Michigan's OFIS as required by Mich. Comp. Laws § 500.402." *Foorman*, 2013 WL 1874738, at *2. The question presented in this case — whether Administrative Rule 500.2202(c) voids the discretionary clauses in insurance policies where insurance documents are delivered in Michigan to the beneficiary — was simply not addressed by the court in *Foorman*.

The defendant also undertakes a lengthy discussion arguing that the choice-of-law provision in the contract also renders Administrative Rule 500.2202(c) inapplicable, because the policy states

that it shall be construed according to the laws of the State of Georgia. The defendant does not explain, however, how this discussion has any relevance to the plaintiff's rights, since the plaintiff was not a party to the policy and the present matter is not a contract dispute.

If administrative rules issued under the authority of the Insurance Code have any force in ERISA cases — and they do, *Ross*, 558 F.3d at 602 — then the plain language of Administrative Rule 500.2202(c) governs the validity of discretionary clauses in disability insurance policies in Michigan. Under that rule, a contract document "issued or delivered to any person in this state," which contains a discretionary review clause, will trigger the rule. Mich. Admin. Code. R. 500.2202(c). Thus, if a disability policy is issued in another state, but some insurance contract document is "issued or delivered to any person in this state," *ibid.*, Administrative Rule 500.2202(c) applies, and the discretionary clause is voided, leaving the Court to apply a fresh (*de novo*) standard of review. *See Williams v. Target Corp.*, No. 12-11775, 2013 WL 5372877, at *11 (E.D. Mich. Sept. 25, 2013) (holding that "[b]y expressly covering both policies and certificates, the anti-discretionary clause regulation contemplates a situation where a policy is issued outside the state but a certificate is sent to a beneficiary within Michigan").

The question remains, however, whether any of Liberty's contract documents were "issued or delivered to any person in this state." The record does not lend much help to the plaintiff on that score. He argues that the policy states "that Liberty will provide a certificate to the Sponsor for delivery to Covered Persons." (citing AR 53). That may be true, but the plaintiff has offered no proof that any certificate or other policy document actually was delivered to him or any other "person" in Michigan. Tikkanen contends that the policy "requires" delivery of an insurance certificate to employees, but does not assert that delivery actually occurred. In fact, the policy states

that "Liberty will provide a Certificate to the Sponsor for delivery to Covered Persons." AR 53. It does not require any certificate to be delivered, and the plaintiff has not included any copy of a certificate or other policy document containing a discretionary clause that he asserts was actually delivered to him. This might beg the question how Tikkanen knew he was covered under the policy; and it seems likely that at some point he received some policy-related document that at least informed him of the fact of his coverage. However, in the absence of any proof that any certificate was delivered — or even an example document showing the content of a typical certificate that may have been delivered as a matter of routine — a conclusion that a document was in fact delivered and that it did contain a discretionary clause would be speculative and unsupported by the record.

In the absence of such evidence, there is no basis to apply Administrative Rule 500.2202(c) to void the discretionary clause in Liberty's policy. Therefore, the Court must apply the arbitrary-and-capricious review standard.

"Under the arbitrary-and-capricious standard, the determination of an administrator will be upheld if it is 'rational in light of the plan's provisions.'" *McClain v. Eaton Corp. Disability Plan*, No. 13-5395, 740 F.3d 1059, 1064 (6th Cir. 2014) (quoting *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 457 (6th Cir. 2003)). The Sixth Circuit recently has instructed that the arbitrary and capricious standard, while "not without some teeth," also "is not all teeth." *Ibid.* "An 'extremely deferential review,' to be true to its purpose, must actually honor an 'extreme' level of 'deference' to the administrative decision." *Ibid.* "'A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by "substantial evidence."'" *Id.* at 1064-65 (quoting *Schwalm v. Guardian Life Ins. Co. of America*, 626 F.3d 299, 308 (6th Cir. 2010). "'When it is possible to offer a reasoned

explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Id.* at 1065 (quoting *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003).

B.

The main thrust of the plaintiff's argument is that there is evidence that he cannot complete a month of work without missing four or five days due to asthma attacks, and therefore he cannot be employable at any level of exertion. The same holds true, he says, for the regular work day, in which he may be required to take substantial, unscheduled breaks. He contends that under the plan he is "disabled" if he "is unable to perform, *with reasonable continuity*, the Material and Substantial Duties of Any Occupation." Pl.'s Mot. for Summ. J. at 8 (emphasis in original). But the cited definition is from the section applicable to "Class 2" and "Class 3" employees ("eligible salaried associates"), not "Class 1" employees ("full-time hourly associates"). AR 3, 10. The plaintiff admitted at oral argument that he was a "Class 1" employee. That distinction likely makes little difference, however. A person that can work only three out of four weeks per month due to the unpredictable recurrence of the disabling symptoms of a documented illness must be considered disabled from work at any exertional level. The question here is whether Liberty unreasonably concluded that the Tikkanen's medical records and the opinions of the medical experts did not establish that level of incapacitation.

Liberty's decision to deny long-term benefits was justified by substantial evidence. The plaintiff's attack on the reasonableness of Liberty's determination that as of August 28, 2011 he was capable of performing sedentary work without limitations does not withstand an objective analysis of the record. Liberty defines sedentary work as:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

AR 145. All of the work restrictions issued by the plaintiff's medical providers throughout the course of his claim process allowed work that meets the definition above, other than with minor exceptions discussed below. Although Liberty could have completed a formal assessment of Tikkanen's exertional capacity rather than directing its case manager to "assume" sedentary capacity, the lack of procedural formality cannot justify setting aside Liberty's determination, because the restrictions actually issued supported the conclusion that the plaintiff could perform work at least at the sedentary level.

*First*, on May 19, 2011, Dr. Ali completed a work restrictions form that specified the following: (1) lifting no more than 5 to 10 pounds; (2) limiting pushing and pulling to "5-10 pounds"; (3) frequent twisting, squatting, stooping and bending (with a hand written note "can perform"); (4) standing and walking no more than five to ten minutes per hour; and (5) "no limitation" on "sedentary work." AR 227. Dr. Ali also noted on the form that Tikkanen "can drive," his "main problem is [shortness of breath] on activity and exertion," and that Tikkanen could return to work with no restrictions on June 19, 2011.

*Second*, on July 28, 2011, Dr. Ali again completed a work restrictions form which noted the following: (1) no lifting over five pounds; (2) "limit pushing, pulling," with no specified weight; (3) occasional twisting and bending (where "occasional was defined by Liberty as "1-33% of shift"); (4) never squatting, stooping, or kneeling; (5) occasional bending or twisting; (6) standing five to

ten minutes per hour; and (7) walking five to ten minutes per hour. The restrictions noted "sitting" as "ok" with no specified duration. AR 177. Dr. Ali stated that he anticipated that Tikkanen could return to work with no restrictions on September 1, 2011. *Ibid.* The form also includes a hand-written notation by Dr. Ali that "Pt. gets [shortness of breath] on walking few minutes or carrying light load like laundry basket." *Ibid.*

*Third*, on October 26, 2011, Dr. Ali completed a functional capacity questionnaire in which he noted that Tikkanen (1) was "[c]apable of low stress jobs"; (2) could stand or walk for less than two hours a day, and could sit for six hours a day; and (3) could lift ten pounds occasionally, twist frequently, stoop or bend rarely, climb stairs occasionally, and never climb ladders. AR 116-17.

*Fourth*, on the same date P.A. Anthony Hamilton completed a similar questionnaire in which he noted that Tikkanen could (1) sit for up to two hours at a time and stand or walk for up to fifteen minutes; (2) stand or walk for a total of up to two hours a day and sit for "about 4 hours"; and (3) frequently lift up to ten pounds, rarely lift twenty pounds, frequently twist, stoop, bend, or crouch, and rarely climb ladders or stairs. AR 122-23.

The July 28, 2011 restrictions issued by Dr. Ali establish, at most, that Tikkanen could perform sedentary work, subject to a five-pound lifting restriction — a limitation that perhaps was transitory, suggested by the fact that Ali had imposed a ten pound restriction in May 2011, and both Hamilton and Ali stated restrictions between ten and twenty pounds in October.

Liberty's conclusions that the restrictions issued by Tikkanen's physicians were consistent with a sedentary exertional capacity, and that restrictions in hours of work per day or predictions of excessive absences were not supported by available medical evidence, were justified. The putative restrictions discussed by Jennifer Turecki are not supported by any objective tests or diagnoses in

the record, and they are not consistent with the prior restrictions issued by the plaintiff's medical providers. The only test results reflecting Tikkanen's pulmonary function revealed a "minor functional limitation" on the first test and a capacity of at least 9 METS during the second test, which Dr. Berg asserts (and the plaintiff does not appear to dispute) is adequate to allow sedentary and even higher levels of exertion. The plaintiff points to no medical evidence to explain why he was allowed to sit without limitation in July 2011, but could sit for only four hours a day in October. The prior limitations issued by Dr. Ali and P.A. Hamilton placed no time limits on sitting and specified only that he should be limited to standing or walking no more than five or ten minutes per hour. Moreover, as Dr. Berg noted, during their conversation in April 2012, Dr. Ali agreed with Dr. Berg's conclusion that Tikkanen could perform sedentary work with no limitations, and the plaintiff does not dispute that Ali suggested on July 28, 2011 that Tikkanen should return to work. Turecki's assertions that Tikkanen must avoid all stress appear to be based on a simple misreading of the form that Dr. Ali completed, because on that form Dr. Ali actually checked the box that corresponds to "can perform low stress jobs."

*Fifth*, as discussed above, Liberty's determination was supported adequately by Dr. Ali's consistent description of Tikkanen's diagnosis as "mild" or "moderate" asthma. Tikkanen does not suggest that Dr. Ali's diagnosis was in error or failed to account for his condition in any way, and he offers no evidence to suggest that asthma which is "mild" or "moderate" would preclude sedentary work without limitations.

Liberty's determination is supported by substantial evidence in the record. There is no basis here to decline deference to that decision.

III.

The decision by defendant Liberty Life Assurance Company of Boston to deny plaintiff Thad Tikkanen long term disability benefits under the group policy issued for the benefit of Home Depot employees was neither arbitrary nor capricious.

Accordingly, it is **ORDERED** that the defendant's motion to affirm the Plan administrator's decision [dkt. #14] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion to reverse the Plan administrator's decision [dkt. #14] is **DENIED**.

It is further **ORDERED** that the complaint, as amended, is **DISMISSED WITH PREJUDICE**.

                                                        s/David M. Lawson
                                                        DAVID M. LAWSON
                                                        United States District Judge

Dated:   July 14, 2014

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 14, 2014.

                              s/Shawntel Jackson
                              SHAWNTEL JACKSON